# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                      No. 10-CR-2138 WJ

TOMMY PENA,

    Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS MATTER comes before the Court on a bench trial held on December 14 and 15, 2010 and Defendant's Motion to Dismiss Counts 1, 2, 4, 9, 10 and 12, filed March 31, 2011 (Doc. 63). The indictment, filed on July 22, 2010 (Doc. 18), charges Defendant Tommy Pena with two counts of conspiracy (Counts 1 and 9); two counts of carjacking and aiding and abetting (Counts 2 and 10); two counts of using and carrying a firearm during and in relation to a crime of violence (Counts 4 and 12); four counts of felon in possession of a firearm (Counts 6, 8, 14, and 15); and one count of possession of methamphetamine (Count 16). Defendant executed a waiver of jury trial (Doc. 53), and the Court held a pretrial hearing on the matter (Doc. 55). Defendant was questioned during the hearing and indicated that his waiver of jury trial was knowing, voluntary, and intelligent, and the Court so found. The case proceeded to a bench trial before the Court on December 14 and 15, 2010 (Doc. 57). At the conclusion of trial, the Court found Defendant guilty on Counts 6, 8, 14, 15, and 16, charging possession of methamphetamine and felon in possession of firearms and/or ammunition. Tr. at 417-26.[1] Defendant reserved

---

[1] Hereafter, "Tr." refers to Transcript of Bench Trial, vols. I and II (Docs. 60 & 61).

closing argument on the other counts for written briefing. The Court now finds Defendant guilty on Counts 1, 2, and 4, and not guilty on Counts 9, 10 and 12.

## FINDINGS OF FACT

Based on the testimony and physical evidence introduced at trial, the Court makes the following findings of fact relevant to Counts 1, 2, 4, 9, 10 and 12 of the indictment.

**I.     April 6, 2010: Lacey Carjacking**

1.     Isabel Saucedo, or "Chavela," believed that Arthur Lacey had stolen some cash from her while she was keeping that cash in the Laceys' home in Roswell, New Mexico. Tr. at 39, 42.

2.     Chavela hired Tommy Pena and Jeremy Conde[2] to get the cash back from her, or take a car that she believed the Laceys had bought with that cash. Tr. at 107-08.

3.     Pena and Conde agreed with Chavela to get cash or take the car. Tr. at 109.

4.     Chavela promised to pay Pena and Conde with an ounce of methamphetamine, tr. at 109, which has a street value of about $1,500, tr. at 137. Chavela had supplied Collette Lacey, Arthur's wife, with methamphetamine for years. Tr. at 48-49.

5.     Chavela supplied Pena and Conde with pantyhose to hide their faces during the robbery and home invasion. Tr. at 115.

6.     Conde, Pena, and Chavela went to the Laceys' home together in the evening of April 6, 2010. Tr. at 112. Conde drove them in his car, a Nissan Altima, and Chavela gave him directions. Tr. at 112, 121.

7.     Conde was armed with a chrome .380 caliber handgun. Tr. at 113-14; Ex. 35. The gun had bullets in the clip but not in the chamber. Tr. at 113. All Conde had to do to place a round in

---

[2] Conde pled guilty to the charges against him in the indictment and was a government witness at trial.

the chamber was "cock" the gun back. Tr. 157-58. Pena carried a 9 mm handgun. Tr. at 117-18,

140; Ex. 37; *see also* tr. at 420 (finding Defendant guilty of Count 6, felon in possession of a

firearm, on April 6, 2010). Pena's gun was loaded.[3]

8.     When they arrived at the home, the three of them exited the car. Tr. at 121. Chavela

walked Conde and Pena to the side door, telling them that the Laceys never used the front door.

Tr. at 111, 120.

9.     Chavela pointed at the red 2000 Cadillac Eldorado sitting in the front yard and said,

"That's the car," meaning that was the car she wanted Pena and Conde to take. Tr. at 120.

10.    Pena threw a black muscle shirt over the porch light by the door, blocking the light. Tr. at

125.

11.    When Arthur Lacey answered the knock at the door, Pena pointed his gun at Arthur's

face. Tr. at 127.

12.    Pena made gestures towards Arthur as though he were going to shoot Arthur, such as

grimacing his face while gesturing from Arthur's torso to his legs. Tr. at 56-57.

13.    Arthur backed up into the house, with Pena and Conde still pointing their guns at him. Tr.

at 128-29.

14.    As Pena and Conde entered the house, Arthur ran outside. Tr. at 129. He fled to a

neighbor's house, and the neighbor called 911 for him. Tr. at 13.

15.    Conde and Pena proceeded to ransack the Laceys' home, in the presence of Collette

Lacey, then nine months pregnant, and her young children, who had been asleep in their beds

---

[3] The finding that Pena's gun was loaded and deadly may be inferred from the fact that he fired several shots from the same gun on April 10, four days after the home invasion, tr. at 140; that he possessed 9 mm ammunition on April 10 and April 19, tr. at 203-04, 314-15; and that Conde testified that Pena "wouldn't carry a fake gun," tr. at 278.

before the home invasion. Tr. at 18, 22, 29-31, 130-31.

16.  At this point, Conde had his gun out, and Pena had his in his pocket. Tr. at 29.

17.  Collette was following Pena around the house, asking him why he was doing this to her family. Tr. at 45-46.

18.  Collette's daughter woke up and went to her mother, as Conde was pointing his gun at Collette. Tr. at 29-30. Conde ended up pointing the gun directly at the nine-year-old child, who was screaming and "really freaked out." Tr. at 31, 51.

19.  Conde demanded Collette hand over her purse. Tr. at 30. Collette refused. Tr. at 47.

20.  Pena took a laptop from the home. Tr. at 31. In addition, DVDs, two cell phones, and two sets of keys were missing from the home. Tr. at 86.

21.  As he was leaving, Pena noticed some keys hanging above the microwave, to the left of the door. Tr. at 31-32. There was one set of keys to Arthur's car, the 2000 Cadillac, and one set of keys to Collette's car. Tr. at 32. Pena backed up, grabbed the keys to the Cadillac, and left. Tr. at 32.

22.  Pena did not say anything about the keys to Collette, who was standing about a foot away from him at the time. Tr. at 32; 46-47. Pena had his firearm in his pocket, and never pointed it at Collette. Tr. at 29, 44.

23.  Pena drove off in the Cadillac and Conde left with Chavela in his Nissan. Tr. at 133-34.

24.  From the neighbor's home three doors down the street, Arthur watched the Cadillac pull out of the driveway and thought it was his wife leaving. Tr. at 63.

25.  Cadillac vehicles are manufactured by General Motors, who have no manufacturing plants in the state of New Mexico. Arthur Lacey's Cadillac Eldorado was manufactured in Hamtramck, Michigan. Tr. at 354-56.

## II.     April 10, 2010: Drive-by Shooting

26.     In the late evening of April 10, 2010, Pena and Conde were driving in Conde's Altima down East Ballard Street in Roswell, New Mexico. Tr. at 139-45; 163.

27.     Pena fired several shots at the people on the street with a 9 mm handgun. Tr. at 140. This was the same gun used by Pena in relation to the April 6 carjacking. Tr. at 140; *see also* tr. at 420-23 (finding Defendant guilty of Count 8, felon in possession of firearms and ammunition, on April 10, 2010).

28.     Conde was armed with the .380 caliber handgun, the same firearm he used in the Lacey carjacking, and also fired several shots at the people on the street. Tr. at 139, 141-42.

29.     Pena and Conde also possessed rounds of ammunition that day. Tr. at 203-04, 314-16.

## III.    April 18, 2010: Luna Carjacking

30.     On the afternoon of April 18, 2010, Fred Luna was driving his grandfather's truck, a 1982 Chevrolet pickup truck, down the street by the house in Roswell where Pena was staying at the time. Tr. at 224-25, 275-76; Ex. 62.

31.     Conde and Pena were leaving the house when they noticed Luna drive by, cussing at them and giving them a "hard look," which Conde described as "mad dogging." Tr. at 276-77, 294. Luna denies this incident took place. Tr. at 223-24, 244.

32.     Pena and Conde took offense, and decided to borrow Pena's sister's car and follow him. Tr. at 277.

33.     Conde was armed with a loaded .22-caliber handgun and Pena was armed with a black semiautomatic handgun. Tr. at 235, 278; *see also* tr. at 421-22 (finding Defendant guilty of Count 14, felon in possession of a firearm, on April 18, 2010).

34.     Luna noticed them at some point after that, and turned into a church parking lot hoping to

get away from them. Tr. at 227, 229, 280.

35.     Luna pulled up to the church entrance and jumped out of the truck, leaving the door open and the ignition running. Tr. at 232, 284.

36.     Luna tried to open the church doors, but they were locked. Tr. at 230-31, 282.

37.     At that point, Conde and Pena pulled into the church parking lot behind Luna. Tr. at 233, 281-82.

38.     Conde exited the vehicle and Pena stayed inside the car. Tr. at 233-34. They both pointed guns at Luna. Tr. at 233-35, 281-82.

39.     As Conde pointed his gun at Luna, he asked Luna, "What's up now?" Tr. at 281. Pena called Luna a "pussy" and told Luna that he was going to "get" Luna as he aimed his gun at Luna. Tr. at 234, 246.

40.     Luna started running away, to the exit of the church parking lot, expecting to be shot. Tr. at 235-36.

41.     Pena noticed that Luna's truck was still running, and mentioned that fact to Conde. Tr. at 284-85. When Pena made this comment to Conde, Luna was almost out of the parking lot and into the street. Tr. at 285.

42.     Conde got in the truck to drive it off. Tr. at 284.

43.     Luna stopped running away, and turned back towards the truck when he realized he had left the keys in it and that Pena and Conde were taking it. Tr. at 236, 243-44, 283.

44.     Luna was still in the church parking lot, standing about thirty yards away from them. Tr. at 243-44, 285.

45.     Pena urged Luna to "do it," asking him what he was going to do, as Luna was running back toward the truck. Tr. at 236-37. Pena was armed and Luna was not. Tr. at 237. Luna

decided the truck was not worth getting shot over. Tr. at 237.

46.     Conde drove Luna's truck away and Pena followed him. Tr. at 285.

47.     Conde and Pena took the truck to an abandoned house and tore out the stereo and speakers, and wiped it down. Tr. at 289. They left the truck there. Tr. at 287.

48.     Chevrolet vehicles are manufactured by General Motors, who have no manufacturing plants in the state of New Mexico. Luna's Chevrolet pickup truck was manufactured in Janesville, Wisconsin. Tr. at 354-55, 357.

**IV.     April 19, 2010: Pena's Arrest**

49.     On April 19, 2010, Pena was a passenger in a white Nissan which failed to stop when a Roswell police officer activated his emergency lights. Tr. at 254-57. A chase ensued, and the car turned a corner too fast and wrecked into the curb. Tr. at 257-58. Pena exited the car on foot and started running. Tr. at 258. Two officers pursued him, and he was eventually stopped at a fence. Tr. at 263-64. Pena was then arrested. Tr. at 266.

50.     When Pena was arrested, he was in possession of 6.4 grams of methamphetamine. Tr. at 95-96, 100-02, 267.

51.     In the trunk of the white Nissan, which was accessible from the back seat, police found two black shotguns, one of which was loaded with five rounds, and almost a hundred rounds of miscellaneous ammunition. Tr. at 177, 314-28; Exs. 82, 84; *see also* tr. at 423-24 (finding Defendant guilty of Count 15, felon in possession of firearms and ammunition, on April 19, 2010).

## CONCLUSIONS OF LAW

**II.     April 6, 2010: Lacey Carjacking**

    **A.     Count 2: Carjacking**

1.     A conviction under 18 U.S.C. § 2119 requires the government to prove the following elements: (1) the defendant intentionally took a motor vehicle from the presence of another person; (2) the defendant did so by means of force, violence, or intimidation; (3) the motor vehicle had been transported, shipped, or received in interstate commerce; and (4) the defendant intended to cause death or serious bodily injury.  Tenth Circuit Criminal Pattern Jury Instruction ("PJI") 2.79 (2011).

2.     The last element, intent to cause death or serious bodily injury, "is satisfied when the Government proves that at the moment the defendant demanded or took control over the driver's automobile the defendant possessed the intent to seriously harm or kill the driver if necessary to steal the car." *Holloway v. United States*, 526 U.S. 1, 3 (1999). "The offender does not have to display a desire to injure the victim so long as the jury could infer that, had the victim refused to give up his car, the carjacker would have injured him." *United States v. Vallejos*, 421 F.3d 1119, 1123 (10th Cir. 2005). "[I]t is necessary to look at the totality of the circumstances to determine whether the words and actions of the defendants sufficiently demonstrate a conditional intent to cause serious bodily harm." *United States v. Malone*, 222 F.3d 1286, 1291 (10th Cir. 2000).

3.     "[A] number of circuits have expressly held that the use of a firearm in the carjacking is sufficient to establish the conditional intent necessary to satisfy § 2119." *United States v. Vallejos*, 421 F.3d 1119, 1123 (10th Cir. 2005). The Tenth Circuit also adopted this principle in *Vallejos* by finding that the carjacker's "intent to seriously injure or kill a person if he refused to turn over his car can be inferred by his brandishing of a firearm." *Id.* at 1124.

4.     In Collette Lacey's presence, Pena took the keys to the Cadillac for the purpose of stealing that motor vehicle. *See United States v. Moore*, 198 F.3d 793, 797 (10th Cir. 1999) ("person or presence" requirement satisfied by removing keys from the car owner even when the car is out of sight). His actions in taking the keys and driving the Cadillac away were intentional.

5.     Pena took the keys by force, violence, and intimidation. The force, violence, and intimidation can be inferred from the presence of a handgun in his pocket and the previous ransacking of the Laceys' home in the presence of Collette Lacey, then nine months pregnant, and her young children, as well as Pena's nonverbal threat to shoot Arthur Lacey when he opened the door.

6.     The Cadillac Eldorado was manufactured outside of the state of New Mexico, and was transported, shipped, and received in interstate commerce.

7.     Pena had the intent to seriously harm or kill Collette or Arthur Lacey if necessary to steal their car. Again, this may be inferred from the presence of firearms, the ransacking of the Laceys' home, and Pena's nonverbal threat to shoot Arthur Lacey. Concededly, the evidence showed that: Pena never pointed his gun at Collette during the home invasion or carjacking; Collette was following him around the home, asking him why he was doing this to her family, and Pena did not do anything in retaliation; Collette refused Conde's demand for her purse and Conde did nothing further to take it; and Collette was not afraid at the time Pena took the keys from the house. However, this evidence does not outweigh the undisputed evidence introduced by the government showing that the prime objective of the night was the Cadillac, and that Pena and Conde entered the Laceys' house with firearms, intent on stealing the Cadillac. Further, undisputed evidence at trial showed that Pena and Conde are willing to use firearms when they believe it necessary, such as when they participated in a drive-by shooting on April 10, 2010.

8. The Court finds and concludes that the government has proven beyond a reasonable doubt that Defendant, as charged in Count 2, committed the crime of carjacking Arthur Lacey's Cadillac Eldorado.

### B. Count 1: Conspiracy

9. A conviction for conspiracy under 18 U.S.C. § 371 requires the government to prove: (1) the defendant agreed with at least one other person to violate the law; (2) one of the conspirators engaged in at least one overt act furthering the conspiracy's objective; (3) the defendant knew the essential objective of the conspiracy; (4) the defendant knowingly and voluntarily participated; and (5) there was interdependence among the members of the conspiracy; that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged. Tenth Circuit PJI 2.19.

10. Pena agreed with Conde and Chavela to unlawfully take Arthur Lacey's Cadillac.

11. Pena and Conde engaged in a series of overt acts, including driving to the Laceys' home, entering the house with their guns drawn, searching and ransacking the house, taking the car keys from inside the home, and driving off in the stolen Cadillac.

12. Pena knew that the essential objective of the conspiracy was to unlawfully take Arthur Lacey's Cadillac. Chavela pointed out the Cadillac in the front yard as the conspirators approached the Laceys' home as their target, and Pena removed the car keys from inside the home with the intent of using them to take the car.

13. Pena knowingly and voluntarily participated in the conspiracy, as evidenced by his expectation of receiving an ounce of methamphetamine, worth about $1500.

14. There was interdependence among the co-conspirators. Chavela planned the expedition, supplied Conde and Pena with pantyhose to hide their faces, directed them to the Laceys' house,

and instructed them to take the side door. Pena and Conde took over from there, entering the house with guns drawn and stealing the Cadillac and other household items. The success of the conspiracy depended on each conspirator performing his or her own role.

15.     The Court finds and concludes that the government has proven beyond a reasonable doubt that Defendant, as charged in Count 1, conspired to unlawfully take Arthur Lacey's Cadillac Eldorado.

        **C.     Count 4: Using or Carrying a Firearm During and in Relation to a Crime of Violence**

16.     A conviction under 18 U.S.C. § 924(c) requires the government to prove the following elements: (1) the defendant committed a crime of violence; (2) the defendant used or carried a firearm; (3) during and in relation to the crime of violence. Tenth Circuit PJI 2.45.

17.     Carjacking is a crime of violence. *United States v. Brown*, 200 F.3d 700, 706 (10th Cir. 1999).

18.     Pena knowingly carried a firearm on April 6, and used it by brandishing it at Arthur and Collette Lacey when invading their home and stealing the Cadillac.

19.     Pena's use of this firearm was committed during and in relation to the carjacking. He carried the firearm for the purpose of stealing the Cadillac, and the firearm played an integral role in the motor vehicle theft.

20.     The Court finds and concludes that the government has proven beyond a reasonable doubt that Defendant, as charged in Count 4, used and carried a firearm during and in relation to the crime of carjacking Arthur Lacey's Cadillac Eldorado.

**II.     April 18, 2010: Luna Carjacking**

        **A.     Count 10: Carjacking**

21.     The government contends that Conde committed the offense of carjacking the Chevrolet pickup truck belonging to Fred Luna's grandfather, and that Pena is guilty of aiding and abetting in the carjacking.

22.     A conviction under 18 U.S.C. § 2 for aiding and abetting requires the government to prove the following elements: (1) someone else committed the charged crime; and (2) the defendant intentionally associated himself in some way with the crime and intentionally participated in it as he would in something he wished to bring about. Tenth Circuit PJI 2.06. A defendant possesses the intent necessary to be found guilty of aiding and abetting a carjacking if he "shared some knowledge" of the carjacker's intent to commit the carjacking. *United States v. Vallejos*, 421 F.3d 1119, 1123 (10th Cir. 2005).

23.     The Court finds that Conde did not commit the charged crime of carjacking the Chevrolet pickup truck, because he did not take it from Luna's person or presence.

24.     *United States v. Brown*, cited by the government, holds that the "person or presence" requirement is satisfied "if the victim is sufficiently near to the vehicle for it to be within reach, inspection, or control and, absent threat or intimidation, to be able to maintain control of it." 200 F.3d 700, 705 (10th Cir. 1999) (internal quotation marks omitted). The analysis in the Tenth Circuit's opinion makes it clear that a court should examine the situation *without* reference to threats or intimidation when dealing with the "presence" requirement.

25.     The government conceded at trial, and the Court now finds, that the intent to steal the truck was not formed until Pena pointed out to Conde that the truck was sitting there with the door open and the ignition still running. Tr. at 397-98. Luna had already starting running down the sidewalk for some distance before Pena even made that comment. When Conde jumped in the truck to take it in response to Pena's comment, Luna was standing about thirty yards away.

26.     This case is distinguishable from *Brown* because Conde and Pena's intent to steal the truck was not formed until Luna was thirty yards away from the truck. In *Brown*, the original intent of the defendants in approaching the victim was to commit "robbery, including getting the victim's Explorer." 200 F.3d at 704. The victim left the motor running and the lights on, and "stepped away from his vehicle only briefly before he was accosted." *Id.* at 705. "The vehicle was plainly within [the victim's] reach, inspection and control. Absent the threats and intimidation of [defendants], the victim would have returned to his vehicle and driven away." *Id.* Instead of returning to the vehicle and driving away, the victim in *Brown* was robbed, beaten up, and eventually got away and ran into the nearby residence. *Id.* at 704. While the victim was inside the residence, one of the defendants drove off in his vehicle. *Id.* Given these circumstances, the court concluded that the fact "[t]hat the victim was in the residence, having fled to protect his life, when the vehicle was actually driven away by [a defendant] is of no moment." *Id.* at 705.

27.     While the Court credits Luna's testimony that he turned around from thirty yards away in order to come back as he noticed Conde taking his truck, it is implausible that Luna could have covered the distance of thirty yards before Conde was able to drive off in the truck, regardless of whether or not Conde was armed. The Court finds that, hypothetically, if Pena and Conde were unarmed and Luna had continued running back towards his truck, he still would not have been able to contest Conde jumping into the truck and driving it away. Luna had left the door open and the ignition running, making it all too easy for Conde to take the truck. Conde, a government witness at trial, even testified that Luna would not have been able to get his truck back because "he was too far away. I wouldn't think he would make it back that fast. . . . He wasn't – he would have had to run past the car [that Conde and Pena had arrived in], and then he would have

13

been too far away." Tr. at 287.

28.     Thus, at the time intent to steal the truck was formed, and at the time the truck was actually stolen, Luna was not "sufficiently near to the vehicle for it to be within reach, inspection, or control and, absent threat or intimidation, to be able to maintain control of it." 200 F.3d at 705.

29.     Absent an underlying carjacking offense, Pena is not guilty of aiding and abetting.

30.     The Court finds and concludes that the government has not proven beyond a reasonable doubt that Defendant, as charged in Count 10, aided and abetted the crime of carjacking the Chevrolet pickup truck belonging to Fred Luna's grandfather.

### B.    Count 9: Conspiracy

31.     The indictment charges that Pena conspired to commit the crime of carjacking the Chevrolet pickup truck belonging to Fred Luna's grandfather on April 18, 2010. The Court has found that no carjacking occurred with respect to the Chevrolet pickup truck belonging to Fred Luna's grandfather on April 18, 2010. Absent the underlying carjacking offense, Pena is not guilty of conspiracy to commit carjacking as charged in the indictment.

32.     The Court finds and concludes that the government has not proven beyond a reasonable doubt that Defendant, as charged in Count 9, conspired to unlawfully take the Chevrolet pickup truck belong to Fred Luna's grandfather.

### C.    Count 12: Using or Carrying a Firearm During and in Relation to a Crime of Violence

33.     The indictment charges that Pena used or carried a firearm during and in relation to the crime of carjacking the Chevrolet pickup truck belonging to Fred Luna's grandfather on April 18, 2010. The Court has found that no carjacking of the Chevrolet pickup truck occurred on

April 18, 2010. Absent the underlying carjacking offense, Pena is not guilty of using or carrying a firearm during and in relation to that crime of violence.

34.     The Court finds and concludes that the government has not proven beyond a reasonable doubt that Defendant, as charged in Count 12, used or carried a firearm during and in relation to the crime of carjacking the Chevrolet pickup truck belonging to Fred Luna's grandfather.

**THEREFORE, IT IS ORDERED** that Defendant Tommy Pena is GUILTY of the crimes charged in Counts 1, 2, and 4 of the indictment and NOT GUILTY of the crimes charged in Counts 9, 10 and 12 of the indictment.

**IT IS FURTHER ORDERED** that Defendant Tommy Pena is GUILTY of the crimes charged in Counts 6, 8, 14, 15, and 16 of the indictment pursuant to the findings made on the record at the bench trial.

_____
UNITED STATES DISTRICT JUDGE