# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                   No. 2:10-cr-2138-WJ

TOMMY PEÑA,

       Defendant.

## MEMORANDUM OPINION AND ORDER GRANTING
## UNITED STATES' REQUEST FOR UPWARD VARIANCE

THIS MATTER comes before the Court following a hearing on the United States' Objections to the PSR and Sentencing Memorandum (**Doc. 200**, filed 6/8/18), Defendant's Sentencing Memorandum (**Doc. 205**, filed 7/26/18), and the United States' Objections to Addendum to Presentence Report (**Doc. 214**, filed 9/8/18). The Court has reviewed the parties' pleadings,[1] including Defendant's Response to the Addendum to the Presentence Report and United States' Objections (**Doc. 216**, filed 9/26/18), as well as the reports from the United States Probation Office (**Docs. 182, 190, 212**). The Court has considered the arguments made by counsel and reviewed the testimony and exhibits submitted at the September 10, 2018 hearing. Upon considering this record and the applicable law, the Court grants the United States' request for an upward variance to a total sentence of thirty years in the resentencing of Defendant Tommy Pena for the reasons stated below.

---

[1]     Also including Doc. 208 (Government's Reply to Defendant's Sentencing Memorandum) and Doc. 211 (Defendant's Surreply),

## STATEMENT OF THE CASE[2]

Based on the series of events that transpired between April 6, 2010, and April 19, 2010, Defendant was found guilty by this Court of four counts of being a felon in possession of a firearm and/or ammunition in violation of 18 U.S.C. § 922(g)(1) and § 924(a)(2) (Counts 6, 8, 14, 15), one count of conspiracy to commit carjacking in violation of 18 U.S.C. § 371 (Count 1), one count of carjacking and aiding and abetting in violation of 18 U.S.C. § 2119 and § 2 (Count 2), one count of possession of methamphetamine in violation of 21 U.S.C. § 844(a) (Count 16), and one count of using and carrying a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 4). Doc. 96, Judgment, filed 12/7/11; Doc. 71, Findings of Fact and Conclusions of Law, filed 5/13/11. At the time, Defendant was exposed to an enhanced sentence as an Armed Career Criminal. PSR, ¶¶ 63–64; Doc. 182. The Court imposed a total sentence of 480 months' imprisonment with five years' supervised release, which was within the United States Sentencing Guidelines ("Sentencing Guidelines") range under the 2010 version of the Sentencing Guidelines. Doc. 96; PSR, ¶ 104.

After the United States Supreme Court's decision in *Johnson v. United States*, 135 S. Ct. 2551 (2015), Defendant no longer met the technical requirements of being an Armed Career Criminal, and he successfully filed a petition for resentencing under 28 U.S.C. § 2255. *See* Docs. 180, 181. The Court determined that Defendant would be resentenced under the 2016 United States Sentencing Guidelines, and the parties submitted extensive briefing on the advisory Sentencing Guidelines range and on the United States' request for an upward variance to a total sentence of thirty years' incarceration. There was a hearing before this Court on September 10, 2018, at which

---

[2] The Court provides a more detailed factual recitation regarding the offense conduct, but it is unnecessary to recite the extensive procedural history, so the Court incorporates by reference its factual and procedural recitation in the *Memorandum Opinion and Order* filed on October 2, 2018, ruling on the proper Sentencing Guidelines range. Doc. 217.

time counsel offered oral arguments and the United States presented the testimony of Reshay Childress of the Correctional Programs Division of the Bureau of Prisons in support of its request for an upward variance. The Court informed the parties at the hearing that it would take this matter under advisement to ensure the correct calculation of the advisory Sentencing Guidelines range. In the *Memorandum Opinion and Order* released on October 2, 2018, Doc. 217, the Court determined the proper advisory Sentencing Guidelines range for Defendant's resentencing is 63–78 months based on an offense level of 22 and criminal history category IV, for a total adjusted range of 123–138 months' imprisonment with the § 924(c) sixty-month mandatory minimum consecutive sentence. The Court now considers the United States' request for an upward variance to a sentence of thirty years' imprisonment.

## BACKGROUND

### I.  Factual Summary of 2010 Events

After Defendant executed a knowing and voluntary waiver of jury trial (Docs. 53, 55), this Court conducted a bench trial on December 14 and 15, 2010. Doc. 57. Following the bench trial, the Court found Defendant guilty of Count 16 (possession of methamphetamine) and Counts 6, 8, 14, 15 (violations of § 922(g)). The Court allowed both parties to submit written arguments on Counts 1, 2, 4, 9, 10, and 12. On May 13, 2011, the Court filed the Findings of Fact and Conclusions of Law (Doc. 71) regarding four incidents underlying the charged conduct: the Lacey carjacking on April 6, 2010; the drive-by shooting on April 10, 2010; the Luna car theft on April 18, 2010; and Defendant's arrest on April 19, 2010. Doc. 71.

### A.  April 6, 2010: Lacey Carjacking

Defendant and his co-defendant Jeremy Conde ("Conde") were hired by Isabel Saucedo ("Chavela") to retrieve cash from the household of Arthur Lacey ("Lacey") in retribution for

Chavela's belief that Lacey had stolen cash from her that she was keeping in the Lacey household in Roswell, New Mexico. Doc. 71, ¶¶1–3. In the alternative to retrieving cash from the Lacey household, Pena and Conde agreed with Chavela that they could take a car that Chavela believed Lacey had purchased with the cash. ¶¶ 1–3. Chavela promised to pay Conde and Pena with an ounce of methamphetamine, which had a street value of about $1,500. ¶ 4. Chavela had supplied Collette Lacey, Arthur's wife, with methamphetamine for years. *Id.* Conde, Pena, and Chavela went to the Lacey home on April 6, 2010. ¶ 6. Pena carried a 9 mm handgun that was loaded; Conde carried a firearm with bullets in the clip, but not in the chamber. ¶ 7. Chavela pointed to the 2000 Cadillac Eldorado in the front yard and said, "That's the car," meaning that was the car she wanted Pena and Conde to take. ¶ 9. When Lacey answered the door, Pena pointed the gun at Lacey's face and made gestures as though he intended to shoot Lacey. ¶¶ 11–12. As Pena and Conde entered the house, Lacey fled to a neighbor's house. ¶ 14. Conde and Pena ransacked the Lacey home in the presence of Lacey's wife, Collette Lacey ("Collette"), who was nine months pregnant, and her young children. ¶ 15. Conde pointed his gun at Collette and at one of the children, and Pena's gun remained in his pocket. ¶¶ 16, 18. As Pena was leaving the house with various stolen items, Pena noticed some keys near the door. ¶ 21. He backed up, grabbed the keys to the Cadillac, and left the house. ¶ 21. Pena drove away in the Cadillac. ¶ 23.

Regarding the events that took place at the Lacey house on April 6, 2010, Defendant was charged with one count of conspiracy to commit carjacking (18 U.S.C. § 371) (Count 1), one count of carjacking and aiding and abetting (18 U.S.C. § 2119 and § 2) (Count 2), one count of being a felon in possession of a firearm (18 U.S.C. § 922(g)(1) and § 924(a)(2)) (Count 6), and one count of using and carrying a firearm during and in relation to a crime of violence (18 U.S.C. § 924(c)) (Count 4). The Court found Defendant guilty of the four counts related to the Lacey incident.

### B.    April 10, 2010: Drive-By Shooting

In the evening of April 10, 2010, Conde and Pena drove down East Ballard Street in Roswell and Pena fired several shots at the people on the street with a 9 mm handgun, which was the same handgun used by Pena at the Lacey carjacking. Doc. 71, ¶¶ 26–27. Conde testified that a group of people initiated the shooting, and that he was shot. Doc. 60, Tr. bench trial at 142:6–149:18. In return, both Pena and Conde fired shots at the people on the street in Roswell. *Id.* Conde testified that Pena shot back at the group of people by putting his arm out the window of the passenger side and shooting over the roof of the vehicle. *Id.* at 143:8–23. This shoot-out occurred in the grassy area in front of an apartment building in Roswell. *Id.* at 141:19–24. Pena was charged with one count of being a felon in possession of a firearm (18 U.S.C. § 922(g)(1) and § 924(a)) (Count 8), of which the Court found him guilty.

### C.    April 18, 2010: Luna Car Theft

In the afternoon of April 18, 2010, Conde and Pena were leaving the house where Pena was staying at the time when they noticed Fred Luna ("Luna") drive by them. Doc. 71, ¶¶ 30–31. Conde and Pena thought Luna was "mad-dogging" them by cursing at them and giving them a "hard look," so Conde and Pena decided to borrow Pena's sister's vehicle to follow Luna. ¶¶ 31–32. Conde was armed with a loaded .22-caliber handgun and Pena was armed with a black semiautomatic handgun. ¶ 33. After Luna noticed he was being followed, he pulled into a church entrance and jumped out of his truck, leaving the door open and the ignition running. ¶ 35. The doors of the church were locked and Luna could not enter. ¶ 36. At that point, Conde and Pena pulled into the church parking lot. ¶¶ 37–38. Conde exited the vehicle and Pena stayed inside; they both pointed their guns at Luna. ¶ 38. Pena called Luna a "pussy" and told Luna that he was going to "get" Luna as he aimed his gun at Luna. ¶ 39. Luna testified that Pena had his gun "pretty close"

to him when they were in front of the church, and that he could see the gun clearly. Doc. 60, Tr. bench trial at 234:13–25. Luna testified that it was a Sunday evening when he attempted to enter the church, and that he later thought there were children inside, although he was unaware of that at the time. *Id.* at 235:13–19.

Luna started running away to exit the church parking lot. Doc. 71, ¶ 40. Pena noticed that Luna's truck was still running and mentioned this fact to Conde; at the time of this comment, Luna was almost out of the parking lot and into the street. ¶ 41. Conde got into the truck and drove away. ¶ 42. As Conde was driving away, Luna started running back towards the truck, but after Pena urged Luna to "do it" and asked what he was going to do, Luna decided the truck was not worth being shot. ¶ 45. Conde and Pena took the truck to an abandoned house and tore out the stereo and speakers, then wiped the truck down and left it. ¶ 47.

Regarding the events that took place April 18, 2010, Defendant was charged with one count of carjacking and aiding and abetting (18 U.S.C. § 2119 and § 2) (Count 10), one count of conspiracy to commit carjacking (18 U.S.C. § 371) (Count 9), one count of being a felon in possession of a firearm (18 U.S.C. § 922(g)(1) and § 924(a)) (Count 14), and one count of using and carrying a firearm during and in relation to a crime of violence (18 U.S.C. § 924(c)) (Count 12). Of these charges related to the Luna events, the Court found Defendant guilty of only the offense conduct in Count 14. The Court found the evidence was not sufficient to support a conviction on the related three counts because "at the time intent to steal the truck was formed, and at the time the truck was actually stolen, Luna was not 'sufficiently near to the vehicle for it to be within reach, inspection, or control and, absent threat or intimidation, to be able to maintain control of it.'" ¶ 28 (citing *United States v. Brown*, 200 F.3d 700, 705 (10th Cir. 1999)). The Court could therefore not find Pena guilty of aiding and abetting the underlying offense conduct in Count

10, nor was the evidence sufficient for the conspiracy charge in Count 9 as alleged in the indictment. ¶ 31. Finally, the evidence was insufficient to support the indictment charge for violation of § 924(c) in Count 12 that Pena used or carried a firearm during and in relation to the crime of carjacking the truck on April 18, 2010 because no carjacking occurred. ¶ 33.

### D. April 19, 2010: Pena's Arrest

Pena was a passenger in a white Nissan that failed to stop when a Roswell police officer activated his emergency lights. Doc. 71, ¶ 49. A chase ensued, and after the vehicle wrecked into a curb, Pena fled on foot and was eventually stopped. ¶ 49. The Court found that when Defendant was arrested on April 19, 2010, he was in possession of two black shotguns, one of which was loaded with five rounds, almost a hundred rounds of miscellaneous ammunition, and 6.4 grams of methamphetamine. Doc. 71, ¶¶ 49–51. He was charged with one count of being a felon in possession of a firearm (18 U.S.C. § 922(g)(1) and § 924(a)) (Count 15) and one count of possession of methamphetamine (21 U.S.C. § 844(a)) (Count 16). The Court found Defendant guilty of both counts.

## II. Procedural posture

At the original sentencing in 2011, Pena was exposed to an enhanced sentence as an Armed Career Criminal because of two felony convictions for shooting at a dwelling, in violation of NMSA § 30-3-8(A), and a conviction for aggravated assault with a firearm, in violation of NMSA § 30-3-2. PSR, ¶¶ 63–64; Doc. 180 at 4. The Court determined that Count 4 carried a mandatory minimum sentence of 7 years' imprisonment for using and brandishing a firearm in relation to the carjacking that occurred on April 6, 2010, pursuant to § 924(c)(1)(A)(ii). PSR, ¶¶ 67, 103. With enhancements as an Armed Career Criminal and as a Career Offender, the advisory Sentencing Guidelines range was calculated to be 360 months' incarceration to life imprisonment. PSR, ¶¶

63–64, 104. The Court adopted the PSR and imposed 180 months' incarceration as to Counts 1 and 2; 360 months' incarceration as to Counts 6, 8, 14, and 15; and 12 months' incarceration on Count 16, all of which were to run concurrently. The Court imposed 120 months' incarceration on Count 4, which was to run consecutively, pursuant to § 924(c)(1)(A)(ii) and U.S.S.G. § 2K2.4(b). In total, the Court imposed 480 months' imprisonment, which was within the advisory Sentencing Guidelines' range. Doc. 96; PSR, ¶ 104.

The Supreme Court of the United States invalidated the Armed Career Criminal Act's ("ACCA") "residual clause" in *United States v. Johnson*, 135 S. Ct. 2551 (2015), which formed the basis of Defendant's motion for relief under 28 U.S.C. § 2255. Docs. 152, 160. This Court adopted the Proposed Findings and Recommended Disposition in an Order granting in part Defendant's request for resentencing without the ACCA enhancement and denying Defendant's motion in all other respects. Doc. 181, filed 2/1/18.

After briefing from the parties regarding which version of the Sentencing Guidelines was applicable for resentencing, the Court ruled that Pena would receive a de novo resentencing under the 2016 Sentencing Guidelines. Doc. 193, filed 4/6/18. Upon extensive briefing from the parties and reports from Probation about the proper Sentencing Guidelines calculations, the Court ruled that the correct Sentencing Guidelines range in this matter is 63–78 months based on an offense level of 22 and criminal history category IV. Doc. 217, filed 10/2/18. All parties were in agreement that although Pena was previously sentenced according to a seven-year mandatory minimum for brandishing a firearm pursuant to § 924(c), he is correctly subject to a five-year mandatory minimum for possession of a firearm in violation of § 924(c) due to the indictment's omission of the brandishing element. Doc. 217 at 9 n.1. Thus, the total Sentencing Guidelines range in this matter is 63–78 months, which comes to 123–138 months with the § 924(c) sixty-month mandatory

minimum. The parties have now extensively briefed, presented oral arguments, and offered evidence about the Government's request for an upward variance to a total sentence of thirty years in the matter of Pena's resentencing. *See* Docs. 200, 205, 208, 211, 214, 216; Clerk's Minutes from Sept. 10, 2018 hearing, Doc. 215; Transcript of Sept. 10, 2018 hearing, Doc. 221.

## DISCUSSION

### I.     Sentencing Law

As the Tenth Circuit has explained, "a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2)." *United States v. Conlan*, 500 F.3d 1167, 1169 (10th Cir. 2007) (citation omitted); 18 U.S.C. 3553(a)(2).[3] Section 3553(a) states the factors the district court must consider when crafting a sentence to satisfy the goals stated in § 3553(a)(2). Still, the district courts have wide discretion in assigning weight to these factors. *United States v. Yanez-Rodriguez*, 555 F.3d 931, 946 (10th Cir. 2009) ("[D]istrict courts have broad discretion to consider particular facts in fashioning a sentence under 18 U.S.C. § 3553(a), even when those facts are already accounted for in the advisory guidelines range."). Thus, "after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The Circuit has stated that "there are perhaps few arenas where the range of rationally permissible choices is as large as it is in sentencing," which is "a task calling on a district

---

[3]     18 U.S.C. § 3553(a)(2) provides the goals of sentencing as the need for the sentence imposed—

(A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)  to afford adequate deterrence to criminal conduct;
(C)  to protect the public from further crimes of the defendant; and
(D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; . . . .

court's unique familiarity with the facts and circumstances of a case and its judgment in balancing a host of incommensurate and disparate considerations, ranging from the degree of the defendant's cooperation and remorse to the need for deterring potential future offenders." *United States v. McComb*, 519 F.3d 1049, 1053–54 (10th Cir. 2007) (quoting *United States v. Ruiz-Terrazas*, 477 F.3d 1196, 1201 (10th Cir. 2007)).

One of the sentencing factors provided in § 3553(a) is consideration of the properly calculated Sentencing Guidelines range based on the offense conduct and the criminal history category of the defendant. § 3553(a)(4). The Supreme Court of the United States explained in *Gall v. United States*, 552 U.S. 38 (2007), that although the Sentencing Guidelines are advisory, they "should be the starting point and the initial benchmark[]" in determining a sentence. 552 U.S. at 49. The Supreme Court further stated that if the judge "decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one." *Id.* at 50. The *Gall* Court rejected the notion, however, of a "rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range" and of "the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." 552 U.S. at 47; *see also United States v. Lente*, 759 F.3d 1149, 1158 (10th Cir. 2014). Therefore, there are no "magic words" the court is required to recite at sentencing, but the court must "explain its reasons for imposing a sentence." *United States v. Martinez-Barragan*, 545 F.3d 894, 902–03 (10th Cir. 2008). While there is no requirement that the court "explicitly refer to either the § 3553(a) factors or respond to every argument for leniency that it rejects in arriving at a reasonable sentence[,]" the court must

address "the material, non-frivolous arguments made by the defendant." *Yanez-Rodriguez*, 555 F.3d at 948; *United States v. Pinson*, 542 F.3d 822, 833 (10th Cir. 2008).

## II. Application of Section 3553(a) sentencing factors

In accordance with this Court's sentencing authority, the Court explains below the sentencing factors to which it gives significant weight in crafting a sentence that is sufficient but not greater than necessary to meet the goals of sentencing.[4]

### A. Section 3553(a)(4): Consideration of the kinds of sentence and sentencing range

The Court previously determined that the correctly calculated Sentencing Guidelines range in the matter of Defendant's resentencing is 63–78 months, plus a consecutive term of sixty months for the § 924(c) mandatory minimum, for a total advisory Sentencing Guidelines range of 123–138 months. Doc. 217. The Court devoted significant time to determining the proper Sentencing Guidelines range because the Supreme Court has made clear that the first step in federal sentencing is to determine the correctly calculated advisory Sentencing Guidelines range. *Gall*, 552 U.S. at 49. Upon consideration of the applicable Sentencing Guidelines range, the Court finds that a total sentence of 123–138 months is woefully inadequate to accomplish the goals of sentencing in this case. For the reasons described below, the Sentencing Guidelines range of 123–138 months fails to capture the seriousness and dangerousness of Pena's offense conduct, the ongoing threat he poses to public safety, and adequate deterrence in light of the high likelihood that he will reoffend.

Contrary to Defendant's assertion, the Court does not treat the forty-year sentence it previously imposed in 2011 as the starting point for this analysis on re-sentencing. *See* Doc. 211 at 4. Thus, the Court rejects Defendant's argument that this Court is not considering the correctly

---

[4] The Court does not give much weight to the consideration of the need to provide restitution to any victims of the offense in this case because the restitution that was ordered has been paid, so there is no outstanding amount to be repaid. Amended Judgment of Conviction, Doc. 108.

calculated advisory Sentencing Guidelines range as the starting point for the upward variance (*see* Doc. 211 at 4), as this Court has carefully and thoroughly examined whether a sentence within the advisory Guidelines range would meet the goals of sentencing in this matter—the Court concludes it would not, but the Guidelines range does constitute the starting point in the following analysis.

**B.      Section 3553(a)(1): Consideration of the nature and circumstances of the offense and the history and characteristics of defendant**

**1.      Nature and circumstances of the offense**

As explained in the factual recitation, Defendant was convicted of offense conduct comprised by four instances of firearms possession over a short period of time, which are grouped into a single unit for the purposes of the Sentencing Guidelines under USSG § 3D1.2. *See* Doc. 271 at 15. As the Government phrases it, Pena engaged in a "three-week reign of terror," Doc. 200 at 9, during which he used, brandished, and possessed multiple firearms while committing state and federal offenses. The Court considers each of these instances individually to convey the overwhelming seriousness of the offense conduct.

First, regarding the nature and circumstances of the Lacey carjacking on April 6, there are certain facts that make the Lacey home invasion and carjacking particularly reckless. Collette Lacey was nine months pregnant at the time Pena and Conde ransacked the home. She had at least two small children who were present, and the record reflects that Conde pointed his handgun at the face of the nine-year-old. While the Court found that Pena did not point his loaded handgun at Collette or at her children, Pena initiated the entry into the home by pointing his handgun at Arthur Lacey in a threatening manner when Lacey came to answer the door. The brandishing of firearms to gain entry to the home and during the ransacking of the residence in the presence of the children and the pregnant wife makes the co-conspirator conduct highly dangerous and reckless. The record does reflect that Collette Lacey had some relationship with Chevala, the woman who hired Pena

and Conde to ransack the Laceys' home, through drug transactions, but the endangerment of the children and the full-term pregnancy implicates completely innocent victims. Neither the Sentencing Guidelines range encompassing Counts 1, 2, and 6, nor the mandatory minimum for the § 924(c) conviction in Count 4, capture the endangerment of the entirely innocent children, or the potential consequences this situation could have had on the full-term pregnancy of Collette Lacey.

Additionally, the April 10 drive-by shooting in Roswell that underlies the felon in possession charge in Count 8 clearly demonstrates the seriousness of the offense conduct. Conde testified that a group of people initiated the shooting, and that he was shot. Doc. 60, Tr. bench trial at 142:6–149:18. In return, both Pena and Conde fired shots at the people on the street in Roswell. *Id.* Conde testified that Pena shot back at the group of people by putting his arm out the window of the passenger side and shooting over the roof of the vehicle. *Id.* at 143:8–23. This shoot-out occurred in the grassy area in front of an apartment building in Roswell. *Id.* at 141–19–24. There is no corresponding federal crime for shooting at a dwelling or occupied building from a motor vehicle, but in this case it constitutes a fourth-degree felony under New Mexico law. NMSA § 30-3-8. Also, as the Government points out, Pena could have faced an additional mandatory consecutive sentence under 18 U.S.C. § 924(c)(1)(C)(i) if he could have been charged with a federal offense. Doc. 200 at 10. The Court points to this sentence possibility to show the seriousness of Pena's offense conduct, even if he did not sustain federal convictions for the act of the drive-by shooting. Moreover, no one can dispute the serious and potentially dangerous threat to innocent life by Pena's conduct of putting his arm out the window of the passenger side and shooting over the roof of the vehicle.

The Court also considers the offense conduct of the Luna car theft on April 18, 2010, even though Pena was acquitted of the federal carjacking charges.[5] Again, the Court highlights the seriousness of the offense conduct to illuminate the ongoing threat to public safety Pena poses. Conde and Pena pursued Luna because he was "mad-dogging them" and gave them a "hard look" when Luna was driving by in his vehicle, which indicates that Pena escalated the situation based on a small provocation. Additionally, the defendants followed Luna to a church parking lot, where they both pointed their firearms at Luna as he ran to the door of the church. This conduct could have placed any number of innocent bystanders in danger, especially in light of the location. Churches are places of worship and as such, they are gathering points that attract high numbers of vulnerable populations, including children, the disabled, and the elderly. Luckily, churchgoers and members of the public were not affected at the time, and the church doors were locked, clearly suggesting that worshipers were not present. However, this fact does not detract from the potential harmful consequences on the public of the Luna incident, of which Pena was aware as he pointed his gun at Luna.

Finally, at the time of his arrest, Pena was in possession of two shotguns, almost one hundred rounds of ammunition, and over six grams of methamphetamine. While the circumstances of his arrest considered alone may not normally support an upward variance, Pena's continued

---

[5]     The Supreme Court and the Tenth Circuit have ruled that a sentencing court may consider acquitted conduct when fashioning an appropriate sentence. *United States v. Watts*, 519 U.S. 148, 154 (1997) (per curiam); *United States v. Todd*, 515 F.3d 1128, 1137–38 (10th Cir. 2008) ("The Supreme Court and this circuit have both expressly held that acquitted conduct can be considered for purposes of sentencing."). An acquittal, either by a jury or by bench trial, reflects that the elements of the charges could not be proven beyond a reasonable doubt. *Watts*, 519 U.S. at 156. Facts used at sentencing, however, must be found by a preponderance of the evidence. *Id.* Acquitted conduct may therefore be within the umbrella of the conduct the sentencing court examines. *Id.* at 156–57. In the instant case, this Court found Pena not guilty of the federal carjacking charge and the related § 924(c) and conspiracy charges because the intent to steal Luna's truck was not formed until Luna was thirty yards away from the truck. Doc. 71, ¶ 26. The Court concluded that, as a matter of law, Luna was not "sufficiently near to the vehicle" to constitute carjacking. Doc. 71, ¶ 28. The Court relies on its Findings of Fact and Conclusions of Law (Doc. 71) regarding the offense conduct, which is still relevant to determining an adequate sentence because of the felon in possession conviction in Count 14.

possession of multiple firearms and methamphetamine demonstrates his obvious disregard for the law and public safety during his crime spree in Roswell.

## 2. History and characteristics of the defendant

In addition to the underlying felony convictions and Defendant's adult criminal convictions described below, the Court relies on two considerations for which the Sentencing Guidelines do not account in examining Pena's history and characteristics: first, relevant adjudications and conduct from Pena's juvenile record, and second, Pena's post-conviction conduct while incarcerated in the Bureau of Prisons. In the following discussion, the Court also addresses Pena's arguments regarding his completion of educational coursework while incarcerated and his argument that he is statistically less likely to recidivate. Ultimately, the Court does not find Pena's arguments or his evidence persuasive enough to outweigh the substantial weight the Court assigns to the nature of his adult criminal convictions for violent offenses involving firearms, his juvenile conduct involving firearms use, and his post-conviction conduct involving possession of dangerous weapons while incarcerated.

Relevant adult convictions: Before explaining the Court's considerations for which the Sentencing Guidelines do not account, the Court first recaps Pena's adult criminal convictions. *See United States v. Yanez-Rodriguez*, 555 F.3d 931, 946 (10th Cir. 2009) ("[D]istrict courts have broad discretion to consider particular facts in fashioning a sentence under 18 U.S.C. § 3553(a), even when those facts are already accounted for in the advisory guidelines range."); *United States v. Jarvi*, 537 F.3d 1256, 1263 (10th Cir. 2008) ("[D]istrict courts have broad discretion to consider individual characteristics like age, employment, and criminal history in fashioning an appropriate sentence under 18 U.S.C. § 3553(a), even when disfavored under the Guidelines or already accounted for in another part of the calculation." (internal citations omitted)). While Defendant's

criminal history category accounts for his adult convictions in calculating the Sentencing Guidelines, the Court references the following convictions to demonstrate the pattern of violent crime and firearms possession that Pena has continued since he was fourteen years old.

In February 2005 (age 19), Pena was arrested for felony shooting at a dwelling or occupied building, along with two related felonies. PSR, ¶ 73. The facts underlying these convictions reflect that Pena and Conde fired multiple shots at a home in Roswell in a drive-by shooting, striking the home and two parked cars in front of it. *Id.* Officers were on patrol and heard approximately twenty shots fired. *Id.* No one was injured during the shooting. *Id.* When officers attempted to apprehend the vehicle in which Pena and Conde were both passengers, the vehicle drove away at a high rate of speed. *Id.* Pena was found guilty in December 2005 and sentenced to a total of 66 months. *Id.* Pena's parole commenced on May 1, 2009 and was revoked in July 2009 because he associated with Jeremy Conde, which was a violation of his conditions. *Id.* Pena completed his remaining term of incarceration, which finished on March 6, 2010. *Id.*

In September 2005, Pena was arrested for one count of felony aggravated assault, which included a firearms enhancement, and felony shooting at a dwelling or occupied structure. PSR, ¶ 74. The two victims stated they were on their porch with their child when Pena exited his aunt's house across the street and started "mad-dogging" them. *Id.* Pena went back into the house and returned carrying a firearm, which Pena pointed at the victims across the street. *Id.* They went inside their home and reported that later that night they heard gunshots and that several gunshots struck the walls of their bedroom. *Id.* Based on witness descriptions, officers located Pena and recovered a handgun in his pocket. *Id.* No one was injured in the shooting. *Id.* Pena was sentenced to a total of 48 months, which was to run concurrent with the charges from his arrest in February of the same year. *Id.* Pena was released from his term of imprisonment for these felony offenses

on March 6, 2010. *Id.* He committed the offenses upon which this sentencing is based starting on April 6, 2010, with the Lacey carjacking.

Relevant juvenile conduct and adjudications: The Tenth Circuit has confirmed that the sentencing court may consider a defendant's behavior as a juvenile when it is relevant to evaluating his threat to the public under § 3553(a)(2)(C). *United States v. Pinson*, 542 F.3d 822, 835–36 (10th Cir. 2008). In *Pinson*, the Tenth Circuit ruled that the defendant's complaint "that the district court improperly relied on his juvenile conduct" had "no merit," finding that consideration of a defendant's juvenile record was not procedurally unreasonable and that the resulting sentence was not substantively unreasonable. *Id.* at 835. The Circuit reiterated its position by stating that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *Id.* at 836 (explaining that limits on this principle would include, for example, the impermissible consideration of a defendant's race in crafting a sentence) (citing *United States v. Magallanez*, 408 F.3d 672, 684 (10th Cir. 2005) and 18 U.S.C. § 3661); *see also United States v. Soto-Arreola*, 486 F. App'x 735, 741 (10th Cir. 2012) (affirming district court's consideration of juvenile adjudications and "bare arrest records" that indicated arrests without subsequent convictions). The majority of circuits have confirmed that the sentencing court may consider juvenile conduct when it does not incur criminal history category points as grounds supporting an upward variance when the juvenile record shows high likelihood of recidivism and dangerousness to the public.[6]

---

[6] *See, e.g.*, *United States v. Horton*, 638 F. App'x 469, 472 (6th Cir. 2016) ("[O]ur precedent permits juvenile offenses to be considered in sentencing, whether in the context of an upward departure or, analogously, an upward variance."); *United States v. Williams*, 648 F. App'x 843, 845 (11th Cir. 2016) ("[T]his Court has upheld upward variances in light of a defendant's numerous juvenile adjudications, as well charges that were not pursued."); *United States v. Garcia*, 528 F. App'x 57 (2d Cir. 2013) (ruling district court's upward variance in consideration of defendant's juvenile record was appropriate); *United States v. Jones*, 476 F. App'x 484, 491 (3d Cir. 2011) ("[N]on-countable juvenile offenses can be used to increase a defendant's sentence above the Guidelines' recommended

The presentence report, from Paragraphs 68–71, details Pena's criminal juvenile record adjudications. The first significant offense in Pena's juvenile record was at age thirteen,[7] when he was adjudicated delinquent for felony burglary for stealing a purse from a vehicle. PSR, ¶ 69. Then, at age fourteen, Pena was adjudicated delinquent for armed robbery, false imprisonment, tampering with evidence, unlawful possession of a handgun, and assault with intent to commit a violent felony, all of which are felony offenses. PSR, ¶ 70. He was also charged with felony battery and misdemeanor resisting/obstructing arrest for the same incident, but those counts were dismissed. *Id.* The PSR narrative provides as follows:

> According to an arrest report provided by the Roswell Police Department, the victim of the offense reported that she had just arrived home from the store when she was approached by the defendant at her front door. She described the defendant as wearing a blue bandanna across his face and a blue and white shirt. The victim reported that the defendant was armed with a handgun and demanded she give him money. The victim advised that she told the defendant she had no money, at which time the defendant removed his bandanna from his face and took her into the house. The victim reported that the defendant removed a VCR, jewelry, and a .380 semi-automatic pistol. He placed the items in a pillow case he had removed from the bedroom. The victim reported the defendant forced her into the dining room where he made her take off all of her clothes. She advised the defendant placed his handgun against her pelvis area, then on her breast, and asked her if she wanted him to shoot her breast off. The defendant then pinched her breast and left the area. After receiving confidential information, police learned that the defendant was a 14 year old named Tommy Pena. When officers attempted to arrest the defendant at his home, he fled on foot armed with the stolen .380 automatic pistol. The defendant was subsequently arrested without incident and the stolen items, including the pistol.

*Id.* Pena was sentenced to two years in the custody of the State of New Mexico Children, Youth and Families Department based on this conduct. *Id.* Next, when Pena was sixteen, he was

---

range . . . .”); *United States v. Humphrey*, 493 F. App'x 564, 570 (5th Cir. 2012) (“[A] district court may appropriately consider juvenile adjudications not accounted for by the Guideline sentence.”); *United States v. Davis*, 48 F.3d 277, 280 (7th Cir. 1995) (“These pubescent transgressions, when considered along with adult offenses, help the sentencing judge to determine whether the defendant has simply taken one wrong turn from the straight and narrow or is a criminal recidivist.”).

[7]     Pena's record contains an adjudication for a curfew violation at age 12, but the Court does not find this adjudication relevant to examining Pena's ongoing threat to the safety of the public or his likelihood of recidivism.

adjudicated delinquent of another incident in which he was identified as the owner of a semiautomatic assault rifle that was thrown out of a vehicle window, as well as possession of methamphetamine at the same time. PSR, ¶ 71. The firearm charge in that instance was a misdemeanor and the possession of methamphetamine was a felony. *Id.* Pena was sentenced to two years in the custody of the Children, Youth, and Families Department. *Id.*

The Court finds these juvenile adjudications relevant to considering Pena's background, character, and conduct in crafting a sentence under § 3553(a) because Pena's juvenile record supports the determination that he continues to be a great danger to society. He was evidently not rehabilitated after his adjudication for felony burglary at age thirteen, and indeed the types of crimes he committed escalated exponentially by the time he was age fourteen. The explicit sexual nature of the threats he made during armed robbery at age fourteen when he terrorized an innocent victim in her home continues to disturb this Court and reinforces the determination that Pena simply did not take one wrong turn, but that since that time, he has been engaged in violent firearms conduct that threatens society. The armed robbery was not a run-of-the-mill home invasion, nor was it a prepubescent transgression, and five juvenile adjudications for felony crimes implicate an ongoing pattern of criminal conduct, much of which involved firearms possession, along with the adjudication for possession of methamphetamine.

Post-conviction disciplinary conduct: As the Tenth Circuit stated in *United States v. Lente*, 759 F.3d 1149 (10th Cir. 2014), "[t]he Supreme Court has held that evidence of post-sentencing conduct may be considered 'when a defendant's sentence has been set aside on appeal and [the] case remanded for resentencing.'" 759 F.3d at 1167 (quoting *Pepper v. United States*, 562 U.S. 476, 490 (2011)) (affirming, in *Lente*, this Court's upward variance after sentencing remand, which in part relied upon the defendant's post-conviction substance abuse while incarcerated). The "plain

language of § 3661 makes no distinction between a defendant's initial sentencing and a subsequent resentencing after a prior sentence has been set aside on appeal." 562 U.S. at 491. Although the defendant in *Pepper* demonstrated positive rehabilitation progress between sentencings, the Tenth Circuit affirmed that "any relevant conduct or events that occurred subsequent to the original sentencing proceeding" may be considered for resentencing, even when that conduct supports an upward variance. *Lente*, 759 F.3d at 1168 (citing *Wasman v. United States*, 468 U.S. 559, 572 (1984)) (explaining that "Lente's post-conviction conduct firmly supports the district court's finding that she was likely to reoffend").

At the hearing on September 10, 2018, the United States presented the testimony of Reshay Childress ("Childress"), who is currently employed as a senior intelligence analyst working for the intelligence section at the Washington, D.C., Bureau of Prisons ("BOP") headquarters office.[8] Childress testified that through his position, he has access to inmate disciplinary information. Prior to his current position, he worked at the United States Prison at Beaumont ("USP Beaumont") from 2013 to 2018. His role was investigating inmate activities and allegations of staff misconduct in the Special Investigative Service department. Childress testified that there are four types of classifications given to offenses committed by inmates. The "400 series" is the least serious classification, increasing in seriousness to the "100 series," which constitutes the most dangerous type of conduct. The 100 series includes offenses such as killing, rioting, weapon possessions, and assaults on individuals. Number 104 is possession of a dangerous weapon.

---

[8]     The summary of this testimony and the admitted exhibits come from the Transcript of Sentencing Hearing on 9/10/18, Volume I, Doc. 221, filed 10/16/18. While the transcript states this was a sentencing hearing, the Court ultimately continued the sentencing hearing so it could determine the proper Sentencing Guidelines range before imposing sentence in this matter. Thus, the September 10 hearing was an evidentiary hearing pertaining to sentencing matters. The Court will cite to the transcript by page and line when quoting verbatim or referencing a specific argument, but for general arguments, undisputed facts, and background, the Court will not provide transcript citations.

After laying this foundation, the Government submitted exhibits relating to Pena's BOP disciplinary record, which were admitted without objection, and about which Childress testified, starting with Government's Exhibit 1. Exhibit 1 is a summary of Pena's current BOP disciplinary record, which shows that five of eight disciplinary actions Pena was subject to during his incarceration at Beaumont were for Number 104 violations, those being for possession of a dangerous weapon. Government Exs. 1A, 1C, 1D, 1G, 1H. Pena also was disciplined for fighting with another person (Number 201, Government Ex. 1F), refusing to obey an order (Number 307, Government Ex. 1E), and possession of an unauthorized item (Number 305, Government Ex. 1B). The Number 104 convictions are significant for a several reasons.

First, based on sustaining some of these violations, Defendant was referred and transferred to the Special Management Unit ("SMU"). The SMU is a special, segregated housing unit that in part restricts an inmate's freedom by taking him out of the general population, limiting some privileges and personal property, and restricting recreational time. *See* Government Ex. 4 (SMU Program Statement). The goal of the SMU is to supervise inmates because of disruptive behavior that necessitates "enhanced management . . . to ensure the safety, security, or orderly operation of Bureau facilities, or protection of the public." *Id.* at 1. The program also requires inmates to complete educational and psychological courses that increase over time with a focus on interactions and developing skills useful during and after incarceration. Childress explained that the coursework and classes must be completed for the inmate to successfully finish the SMU programming and return to general population. The program is "non-punitive," Ex. 4, and, while it imposes more oversight upon the referred inmates through segregated housing, the program also provides useful skills and educational courses. Generally, the program takes twelve months to

complete. There are a number of grounds supporting transfer to the SMU, including participating in group/gang-related activity and incurring disciplinary violations.

Pena was transferred because he had "a history of serious and disruptive disciplinary actions," which is reflected in the checked box on his referral form. *See* Government Ex. 8. The stated explanation for his referral points to his violations for a Number 201 violation (fighting with another inmate) and two Number 104 violations. *Id.* at 2. As defense counsel pointed out on cross-examination of Childress, the referral form reflects that Pena was not transferred to the SMU because of stated gang-related activity, nor was he transferred as a Disruptive Group participant according to the form. During his time in SMU, Pena completed a significant number of classes on a variety of subjects. *See* Defense Exhibit A (discussed in detail below). Childress testified that Pena completed the program in sixteen months.

After Pena was released from the SMU program, he was placed back into the general population at USP Beaumont. After arriving at USP Beaumont, Pena received two more Number 104 disciplinary violations for possession of a dangerous weapon. *See* Government Exs. 1G, 1H. The first was on September 12, 2017. Along with the incident report (Government Ex. 1G), Childress testified about a picture of the homemade knife in the Number 104 violation from September 12, 2017. *See* Government Ex. 9. The exhibit reflects that the blade was measured to be 6.5 inches long. *See* Ex. 1G, Ex. 9. On October 24, 2017, Pena received another Number 104 violation for possession of a dangerous weapon. The picture reflects that the blade measured about 3.5 inches. *See* Government Ex. 10. This last violation involved serious circumstances, as demonstrated in the investigative report submitted by the Government in its Exhibit 5. The report reflects that an inmate requested protective custody, as he was "in fear for his life in general population" because he thought that Tommy Pena intended to stab him. Specifically, this inmate

overheard a group discussing how Tommy Pena, in conjunction with another inmate, planned to stab this inmate. The inmate provided that he "had an issue on the outside" with a member of Pena's family. The prison officials found that there was a credible threat to the safety of this inmate also based on an interview with Pena, in which Pena expressed strong "animosity" towards the inmate. The recommendation was that the inmate be transferred to a different facility. Government Ex. 5. The weapon with the 3.5-inch blade in Exhibit 10 was discovered under Pena's mattress after the inmate made this report to officials.

Finally, Childress testified about a group photograph taken at USP Beaumont, identifying Pena along with five other males dressed in similar, but not identical, clothing. The photograph is labeled "Disruptive Group/Security Threat Group Photo Sheet." Government Ex. 2; *see* also Government Ex. 3. Childress provided that it is customary for prison officials to take "group" photographs of inmates who "normally hang out with each other," and that there are several reasons prison officials take these pictures, including doing a general "reference check" on the individuals pictured and possible gang-related activity. Childress stated he did not know the specific reason for this group photograph. Childress testified that this picture has several "505 boys," which is a geographic group, along with several members of the Syndicato New Mexico ("SNM"), which is a recognized gang. Underneath the picture, Pena's name is listed with the label "505" beside it. Childress testified that based on his experience, he believes Pena is an associate of SNM, although there is not evidence that Pena is a member of SNM. Childress noted that Pena was wearing sunglasses and a bandana of his shoulder in the picture, which distinguished him from the other individuals in the picture; Childress could not identify why Pena was wearing these articles in this photograph or why it was desirable to draw attention to him in this instance.[9]

---

[9]    Government Ex. 3 references the group photograph in Exhibit 2. Government exhibit 3 (which Childress described as a "report card") also lists an incident involving the synthetic drug Suboxone being mailed in a greeting

Childress conservatively estimated he has reviewed tens of thousands of disciplinary reports over his twenty years of experience with BOP. He testified that in reviewing Pena's disciplinary reports, the multiple Number 104 violations stand out as concerning. Childress provided that when an inmate repeatedly has weapons violations, the issue becomes what the inmate is planning to do with the weapons. Childress also pointed out that BOP has lost "quite a bit of staff" to inmates using weapons, which underlies the increasing alarm within management regarding inmates possessing weapons. Defense noted that none of Pena's Number 104 weapons violations indicated that Pena had used a weapon on another inmate or on BOP personnel. Childress also conceded that USP Beaumont, while not as dangerous now as it notoriously was in the past, still has a heightened security risk because of a high number of security-threat groups. He testified that it is not uncommon for Number 104 violations to be assessed against inmates at Beaumont. Still, most inmates, Childress stated, do not continue to "get in trouble anymore" once they leave the SMU. Childress testified that he did not think the SMU program was successful for Pena because Pena continued to incur Number 104 weapons violations after finishing the program. Tr. 44:14–45:4.

The five Number 104 weapons violations reflected in Pena's BOP disciplinary record, two of which were assessed after Pena finished sixteen months in the SMU program, support this Court's conclusion that Pena will continue to possess dangerous weapons that he is prohibited

_____

card addressed to Pena. Childress testified that Pena was not charged with a violation regarding the Suboxone because prison officials "were not able to connect the dots where he requested for the card, so he never was given an incident report for that particular reason." Tr. 39:3–6. While it is not necessary that a defendant actually receive an official disciplinary action for the Court to consider the conduct, the testimony does not allow the Court to conclude that the Suboxone was attributable to Pena, so the Court will not consider Government Exhibit 6. The Court also notes that, as defense pointed out on cross-examination, there is no evidence of a positive urinalysis since Pena has been incarcerated. The Court notes, however, Government Exhibit 7, which contains an investigative report regarding an incident in which Pena was "covered in talcum powder, acting erratically walking around his assigned dormitory." Government Ex. 7. After this incident, Pena refused to provide a urinalysis sample, for which he received a Number 119 violation. Childress did not testify about this incident, but the Government's exhibit was admitted without objection, and thus the Court considers it among the disciplinary violations.

from possessing. *See* Exs. 1A, 1C, 1D, 1G, 1H. After completing the SMU, he not only sustained two more Number 104 violations, but one of those violations resulted in an investigation that found Pena constituted a credible threat against another inmate. The weapons pictured in Exhibits 9 and 10 demonstrate the seriousness of these Number 104 violations—these weapons have blades measuring 3.5 and 6.5 inches, they appear to be incredibly sharp, and they could easily be used to kill another inmate or BOP personnel. Both of these weapons were recovered from Pena within a short period of time of each other, and after he finished with the SMU. The Court credits Childress's testimony about the danger weapons create in prisons, and about how multiple weapons violations raises alarm within BOP management. While the Court understands that USP Beaumont harbors hazards from which inmates may wish to protect themselves, Pena has not pointed to any evidence that he was in unusual danger or the recipient of threats for which he would need to arm himself; indeed, he was determined to be the threat in one instance. Weapons violations like these are ranked highly in BOP's scale of types of violations, and there are only a handful of more serious crimes that rank above Number 104 violations.

The Court gives the five Number 104 violations significant weight because of the pattern they demonstrate about the high likelihood that Pena will recidivate if he were to receive a within-Guidelines range sentence of 123–138 months. Even after approximately seven years in prison and completion of the SMU, Pena has not changed his conduct. Defense argues that the Court should not base its upward variance solely on Pena's BOP record, and the Court agrees that the disciplinary record could not bear the entire weight of the full upward variance—and for this reason, the Court expressly notes that it does not rely solely on this conduct in varying upward from the advisory Sentencing Guidelines range. As described in this entire discussion section, the Court considers all of the § 3553(a) factors, including the nature and circumstances of the offense

conduct, as well as Defendant's juvenile record and the particularly violent firearms possession pattern upon which he has built since the age of fourteen.

This record shows that Pena is determined to possess dangerous weapons and he will continue to defy the law to do so. Five of these violations again show that this is not a "one-off" or a "wrong turn" for Pena, especially after completing the SMU program aimed at controlling and altering disruptive behavior. The Court notes defense's point that there is no evidence that Pena used these weapons on other inmates or personnel, although the investigation in Exhibit 5 supports the inference that he may have intended to do so. The fact that Pena has not yet caused injury to anyone does not persuade the Court on the issue of leniency because Pena's history and characteristics reveal that he is completely capable of causing harm to innocent members of society. In other words, considering Pena's prior firearms charges, he did not cause physical injury to any of those victims either; but the recklessness and impulsivity captured in his prior convictions—including drive-by shootings, armed robbery with explicit sexual threats, and the instant § 924(c) charge—demonstrate that Pena poses a great threat to society when he is in possession of a dangerous weapon. Even upon completion of the SMU program, there is no indication to the Court that Pena will adhere to the law and cease possessing the most dangerous weapons he can get his hands on. Pena's post-conviction conduct "firmly supports" this Court's finding that he is likely to reoffend and that an upward variance is necessary to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant. §§ 3553(a)(2)(B), (C); *see Lente*, 759 F.3d at 1168 (affirming this Court's upward variance based on post-conviction evidence of substance abuse while incarcerated for these same reasons).

Post-conviction completion of educational courses and likelihood of recidivism: First, the Court addresses the letter Pena submitted to the Court at the September 10, 2018 hearing on

sentencing matters. In his letter (Court's Ex. 1), Pena expresses his desire to make amends with and support his children, and to "be a real father." He expresses that he has a particularly troubled relationship with his son, who "feels as though [Pena] choose [sic] the gang and prison life over him." Pena states that he "will do everything humanly possible to make a better life" and asks this Court for a chance to do so. Pena admits that although he maintains he "would never pick anything over [his] kids or family," he understands it may appear that way based on his life style. He also states that it has been "hard in prison" and he "had to adapt to [his] surroundings." Pena asserts that he will not stay in New Mexico after he released from incarceration because he needs a fresh start with his fiancée in Texas. While the Court acknowledges Pena's stated desire to turn his life around and be with his family, his disciplinary conduct while incarcerated does not reflect a willingness to change his dangerous behavior.

Defendant also submitted Exhibit A with his Sentencing Memorandum, which is a transcript of the coursework he has completed while incarcerated. Doc. 205, Ex. A. The transcript reflects that Pena has completed classes on drug education, English proficiency, wellness, parenting, productivity, finances, nutrition, memory, reading comprehension, forklift basics, anger management, life and job skills, welding, and stress management. *See also* Doc. 212, Probation Report summary. Pena maintains he has completed these courses in an effort to improve his education and life skills since entering BOP. Notably, Pena has obtained his GED or high school diploma in compliance with BOP standards. Doc. 205, ¶ 1. Defendant asserts that "[i]nmates who participate in education programs for a minimum of six months are less likely to recidivate when compared to similar non-participating inmates."[10] Doc. 205 at 3 (citing U.S. Department of Justice, About the Federal Bureau of Prisons (hereinafter "About the BOP")). He also argues that his

---

[10]     Available at https://www.bop.gov/resources/pdfs/ipaabout.pdf (last visited Nov. 3, 2018).

successful completion of these courses shows his dedication to building a foundation of skills for post-imprisonment gainful employment.

Regarding his completion of literacy programs, Pena points to the positive aspects of obtaining his GED, which "can provide a pathway to postsecondary education" and important economic benefits.[11] Doc. 205, ¶ 1 (citing Federal Bureau of Prisons, Directory of National Programs (hereinafter "Directory")). He also notes that he has completed a drug education program, which "is designed to encourage inmates with a history of drug use to review the consequences of their choice to use drugs and the physical, social, and psychological impacts of this choice." Doc. 205, ¶ 2 (citing Directory at 11). Pena asserts that occupational programs, like the Forklift and Welding classes he took, focus on developing skills for him to use in gainful employment, which also leads to lower recidivism rates. Doc. 205, ¶ 3 (citing Directory at 5). He asserts that developing a foundation in vocational training leads to lower chances of recidivism. Additionally, he points to the merit of his parenting coursework, which provides applicable skills for during and after incarceration. Doc. 205, ¶ 4 (citing Directory at 8). He completed anger and stress management courses that provide techniques about how to manage these emotions, identify them, and learn skills to improve upon situations non-aggressively, which Pena claims also has a positive effect on avoiding addictions. Doc. 205, ¶ 5. Recreation courses, Pena asserts, have helped to improve his health and make constructive use of leisure time.

Pena also argues that he will be approximately thirty-three years old at resentencing and maintains he would be close to forty when he is released if he receives a sentence near his Sentencing Guidelines request. He was twenty-five at the time of the crimes and maintains that he is much less likely to recidivate, as he will be older upon his release. Pena cites to a 2004 study

---

[11]     Available at https://www.bop.gov/inmates/custody_and_care/docs/BOPNationalProgramCatalog.pdf (last visited Nov. 3, 2018).

from the United States Sentencing Commission ("USSC") to support his position that "[r]ecidivism rates decline relatively consistently as age increases."[12] Doc. 205 at 6 (citing United States Sentencing Commission, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, May 2004 (hereinafter "2004 Study")). He further argues that he will be on supervised release for years, during which time he will be subject to numerous conditions and restrictions to monitor his behavior.

The Government responds to each of Defendant's arguments in kind. First, the United States points out that Pena had to take educational courses while in the SMU or else he would not finish the program. Childress testified to this point as well, remarking that while the classes are voluntary, an inmate cannot successfully complete the SMU program until he finishes certain coursework. The Government also provides that Pena's 2004 study discussed the recidivism rates of offenders over the age of fifty, not forty. *See* 2004 Study at 12.[13] The Government contends that a more recent study by the USSC shows that "firearms offenders had a substantially higher rearrest rate across all age categories than drug trafficking offenders, who in turn had a higher rearrest rate across all age categories than fraud offenders."[14] Doc. 208 at 3 (citing United States Sentencing Commission, The Effects of Aging on Recidivism Among Federal Offenders at 3, Dec. 2017 (hereinafter "2017 Study")). The Government posits that "[o]ffenders whose primary offense

---

[12]     Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf (last visited Nov. 3, 2018); *see also* https://www.ussc.gov/research/research-publications/measuring-recidivism-criminal-history-computation-federal-sentencing-guidelines (last visited Nov. 3, 2018) (summary providing link).

[13]     "Recidivism rates decline relatively consistently as age increases. Generally, the younger the offender, the more likely the offender recidivates. Exhibit 9 illustrates the age recidivism trend of the study sample. Among all offenders under age 21, the recidivism rate is 35.5 percent, while offenders over age 50 have a recidivism rate of 9.5 percent."

[14]     Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf (last visited Nov. 3, 2018).

involved robbery or firearms had higher rearrest rates in all age categories." 2017 Study at 24 (Figure 19).

In comparing the two studies, the Court is convinced that the 2017 Study is more reliable than the 2004 Study because it is more recent, and it includes data from post-*Booker* sentencings. The 2017 Study shows that likelihood of recidivism does indeed decline with increasing age, and while there are many variables among individuals influencing recidivism, "age is generally a strong factor influencing the likelihood of committing crime, although the reasons for this are complex." *Id.* at 11. The 2017 Study concludes that

> the Commission found that older offenders are substantially less likely to recidivate following release compared to younger cohorts. Among offenders released younger than age 21, 67.6 percent were rearrested compared to 13.4 percent of those released age 65 or older. The pattern is consistent across age groups, as age increases recidivism by any measure declined.

*Id.* at 30. To support the Government's position that firearms offenders have higher rates of recidivism, the Court looks at the chart in Figure 19, which shows "Recidivism Rates of Recidivism Study Offenders by Primary Offense Type and Age at Release." *Id.* at 24, Figure 19. For offenders age 30–39 years at the time of release, the rearrest rate is 70.4% for the primary offense type involving firearms. For offenders 40-49 years old, it is 62.8% for the same group, and for 50–59 years it is 44.8%. *Id.*; *see also* chart at A-41. As the Government points out, Pena has a criminal history that includes armed robbery, and he has a numerous firearms charges at this point.

The Court is persuaded by the 2017 Study that a term of thirty years' incarceration in this case is sufficient, but not greater than necessary, to significantly reduce the likelihood of recidivism. The Court acknowledges that Defendant has taken coursework to build a foundation of skills for his life after incarceration; even though Pena was required to take many of those courses for the SMU, the Court does not deny that they will hopefully help Pena contribute in a

positive way to society after his release. Obtaining his GED/High School Diploma may offer more financial and professional opportunities, and vocational classes will provide Pena with skills he can use to build a stable and law-abiding life for himself and his family. Still, even when considering the positive effects of Defendant's post-conviction educational courses, the likelihood that Pena will reoffend is unduly high given his criminal history of firearms and robbery charges, and in consideration of the results in the 2017 Study. This conclusion is not only supported by the 2017 Study, but most importantly by Defendant's own actions and post-conviction conduct as discussed above, which show a lack of effort on Pena's part to even attempt to reform his behavior.

**C.      Section 3553(a)(6): Avoidance of unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct**

Section 3553(a)(6) provides that a sentencing court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a)(6). As the Tenth Circuit has explained, "[a] district court may consider sentencing disparities between co-defendants, but the purpose of the Guidelines is not to eliminate disparities among co-defendants, but rather to eliminate disparities among sentences nationwide." *United States v. Zapata*, 546 F.3d 1179, 1194 (10th Cir. 2008) (citations omitted); *see United States v. Martinez*, 610 F.3d 1216, 1228 (10th Cir. 2010) ("We have interpreted *Gall* to conclude that although § 3553(a) does not require a consideration of co-defendant disparity, it is not improper for a district court to undertake such a comparison." (citations omitted)). When considering a co-defendant sentence, "disparate sentences are allowed where the disparity is explicable by the facts on the record." *Martinez*, 610 F.3d at 1229. As the Tenth Circuit stated in *Zapata*, a "decision to accept responsibility and assist the government does not create an unwarranted disparity under § 3553(a)(6). We have also stated that a disparity among co-defendants is justified when sentences are dissimilar because of a plea bargain." 546 F.3d at 1194

(citations and quotation marks omitted). Finally, "§ 3553(a)(6)'s consideration of unwarranted sentence disparities is but one factor that a district court must balance against the other § 3553(a) factors in arriving at an appropriate sentence." *Martinez*, 610 F.3d at 1228.

Pena argues that the Government's request for an upward variance creates an unwarranted sentence disparity with his co-defendant, Conde, who received a 36-month sentence imposed by this Court. The record in the cases of these two co-defendants demonstrates, however, that the disparity between their sentences is not unwarranted. As explained above, Conde pleaded guilty and testified against Pena at the bench trial in front of this Court in December 2010. *See* Doc. 60, Tr. bench trial at 105–60. Conde's total offense level was 23, with a criminal history category of IV, so that his advisory Sentencing Guidelines range was 70–87 months prior to his § 924(c) mandatory minimum.[15] Moreover, Conde's prior criminal convictions did not qualify him as an Armed Career Criminal even before the *Johnson* decision was handed down by the Supreme Court, so Conde was not subject to the ACCA. In addition to receiving points off his Sentencing Guidelines offense level calculation for acceptance of responsibility, the Government also made a Section 5K Motion for a Downward Departure on behalf of Conde, pursuant to USSG § 5K1.1. The Government requested that this Court impose a sentence of 48 months' imprisonment, although the Court actually sentenced Conde to 36 months based on what was truly substantial assistance to the Government..

There are several reasons why the sentence disparity between Conde and Pena is not unwarranted. First, the Tenth Circuit has stated that when one defendant enters a plea agreement and there is evidence of cooperation with the Government, a resulting disparity is not unwarranted. *Zapata*, 546 F.3d at 1194 ("[A] decision to accept responsibility and assist the government does

---

[15]     The Court accepts the Government's representations that these were the calculations in Conde's PSR.

not create an unwarranted disparity under § 3553(a)(6).”). Additionally, Pena's criminal history record reflects circumstances this Court finds relevant in supporting this upward variance. Pena's post-conviction conduct also presents grounds that were not present in the Court's sentencing of Conde. Indeed, Conde's decision to accept responsibility and, furthermore, to testify at Pena's trial demonstrate his commitment to changing his conduct and reforming his behavior, while the Court has reached the opposite conclusion about Pena's conduct. The Supreme Court in *Gall* credited the district court's decision to "avoid unwarranted *similarities* among other co-conspirators who were not similarly situated." 552 U.S. at 56. In this case, the record shows that these two co-defendants are not similarly situated for the foregoing reasons, as well as regarding relevant circumstances discussed under the considerations in § 3553(a)(1). Thus, any sentence disparity between Conde and Pena is not unwarranted.

Furthermore, Tenth Circuit and Supreme Court precedent provides that the factor the Court must consider under § 3553(a)(6) is a nationwide disparity, not a disparity between co-defendants. *See Martinez*, 610 F.3d at 1228 (explaining that it is not improper under *Gall* to consider co-defendant sentence disparities, but that is not the goal of § 35353(a)(6)). In *United States v. Gantt*, 679 F.3d 1240 (10th Cir. 2012), the Tenth Circuit ruled that "when a court considers what the guidelines sentence (or sentencing range) is, it necessarily considers whether there is a disparity between the defendant's sentence and the sentences imposed on others for the same offense." 679 F.3d at 1249. The Supreme Court stated in *Gall* that "[s]ince the District Judge correctly calculated and carefully reviewed the Guidelines range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities." 552 U.S. at 54. Thus, although the parties have not argued or briefed the nationwide disparity issue with specificity, this Court has

considered any disparity with similarly-situated defendants convicted of similar conduct across the nation, and this Court finds that any such disparity is not unwarranted.

Finally, in light of the Supreme Court's ruling in *Johnson*, Pena's two convictions for shooting at a dwelling under NMSA § 30-3-8 no longer qualify under the ACCA, and as this Court has reiterated, Pena is receiving a benefit of relief under his *Johnson* claim by a reduction from his original forty-year sentence. The ruling under *Johnson* significantly reduced Pena's exposure at resentencing, as it has for certain defendants nationwide. Still, any potential nationwide sentence disparity is not unwarranted in this case when the Court considers "similar conduct" for which other similarly situated defendants have been found guilty. There is no corresponding federal criminal statute for the Luna car theft or for the drive-by shooting on April 10, and Pena was not prosecuted for these crimes in state court. *See* NMSA § 30-16D-1 (unlawful taking of vehicle) and NMSA § 30-3-8 (shooting at occupied building or dwelling). Thus, when considering defendants who have been found guilty of similar conduct, there is a windfall that results for Pena from this Court's finding that Luna, who had run across the church parking lot out of fear of being shot, was not close enough to the vehicle for the theft of it to satisfy the legal definition of carjacking under Tenth Circuit law.[16] As the Government points out, if the crimes of shooting at a dwelling and the Luna vehicle theft were federal offenses, Pena would have faced two additional mandatory consecutive terms of twenty-five years. *See* Doc. 200 at 10 (citing 18 U.S.C. § 924(c)(1)(C)(i)). The Court does not view this *possibility* as a fact in imposing this sentence, and the Court is expressly not imposing this sentence as punishment for the carjacking against Luna because Pena was acquitted of that charge and the related charges. The Court only considers the possibility of

---

[16]     *See* Doc. 71, Findings of Fact and Conclusions of Law, ¶ 28 ("Thus at the time intent to steal the truck was formed, and at the time the truck was actually stolen, Luna was not 'sufficiently near to the vehicle for it to be within reach, inspection, or control, and, absent threat or intimidation, to be able to maintain control of it.'" (citing *United States v. Brown*, 200 F.3d 700, 705 (10th Cir. 1999)).

consecutive mandatory minimums in reference to other, similarly situated cases, to demonstrate how similar conduct may have resulted in mandatory consecutive sentences for defendants nationwide who were found guilty of "similar conduct" that did not hinge on the factual finding that distinguished the Luna incident as vehicle theft and not carjacking under Tenth Circuit law.

### D.     Section 3553(a)(2): Necessity of the sentence to satisfy the goals of sentencing

The Court is required to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" described in § 3553(a)(2). The goals of sentencing as provided in Section 3553(a)(2) are:

(2) the need for the sentence imposed—

> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B)  to afford adequate deterrence to criminal conduct;
> (C)  to protect the public from further crimes of the defendant;
> (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; . . . .

18 U.S.C. § 3553(a)(2). While the sentencing court must consider the factors provided in § 3553(a), crafting a sentence to satisfy the goals of § 3553(a)(2) requires the court to conduct an individualized analysis of each defendant. As the Supreme Court stated in *Gall v. United States*, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." 552 U.S. 38, 52 (2007) (citing *Koon v. United States*, 518 U.S. 81, 113 (1996)). The Tenth Circuit has described sentencing as "a task calling on a district court's unique familiarity with the facts and circumstances of a case and its judgment in balancing a host of incommensurate and disparate considerations, ranging from the degree of the defendant's cooperation and remorse to the need for deterring potential future offenders." *United States v. McComb*, 519 F.3d 1049, 1053–54 (10th

Cir. 2007) (quoting *United States v. Ruiz-Terrazas*, 477 F.3d 1196, 1201 (10th Cir. 2007)). This Court draws on its unique familiarity with the facts underlying the charged conduct, its factfinding and observation of the testimony of witnesses and victims at the bench trial that led to the counts of conviction and to the dismissal of certain charges, and its judgment in assigning weight to the §3553(a) factors based on the foregoing discussion, all of which support this Court's decision that an upward variance to a total sentence of 360 months' incarceration satisfies the sentencing goals of § 3553(a)(2).

First, a lesser sentence would fail "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense[.]" § 3553(a)(2)(A). Particularly in considering the offense conduct discussed above in the § 3553(a)(1) section, Pena's criminal conduct spanned a considerable amount of time, during which he carried out three different sprees of violence that involved firearms and threats to innocent victims or the public. As the Court noted in its above analysis, Arthur and Collette Lacey may not have been completely innocent victims, but their children and Collette Lacey's full-term pregnancy certainly were innocent of any wrongdoing. Pena's brandishing of a loaded firearm to gain entry to the residence and his possession of the loaded firearm during the ransacking and subsequent carjacking was reckless and created imminent danger to innocent children. The same effect on the public at large is true of the drive-by shooting on April 10. The drive-by shooting in front of an apartment complex posed overwhelming risks to the public, especially considering the increasing frequency at which children and innocent bystanders are killed in such shoot-outs every year. Finally, regarding the Luna vehicle theft and the conduct underlying Count 14, Pena created dangerous circumstances for unsuspecting and vulnerable populations who attend church, as well as to Luna himself. A

sentence of 360 months' incarceration properly reflects the seriousness of these offenses, promote respect for the law, and provides just punishment for the offense.

Second, the sentence must afford adequate deterrence to criminal conduct, a consideration upon which the Court has contemplated in light of Pena's relevant juvenile and adult criminal history, as well as his post-conviction conduct. § 3553(a)(2)(B). As discussed above in the § 3553(a)(1) section about Pena's history and characteristics, there is no evidence that criminal convictions and short terms of incarceration have been meaningful deterrents to Pena in the past. Pena committed the instant offenses only a month after he was released from state incarceration for conduct involving firearms. He committed those state offenses at age nineteen in 2005, and after he was released on March 6, 2010, he reoffended on April 6, 2010, with the Lacey carjacking. *See* PSR, ¶¶ 73–74 (imprisonment term for state charges completed and parole term expired on 3/6/10); PSR, ¶ 7 (Lacey vehicle theft on 4/6/10); Doc. 71, ¶ 1 (Lacey vehicle theft on 4/6/10). During his term of incarceration for the instant offenses, Pena has continued to possess dangerous weapons and has received five BOP disciplinary actions for Number 104 violations. After completing the SMU program, which is aimed at curbing this kind of behavior, Pena received two violations for possessing dangerous weapons. Finally, the statistics submitted by the Government in the 2017 Study persuade the Court that Pena is still at high risk for re-offending based on his firearms convictions and armed robbery juvenile history. Even considering the educational and vocational classes he has completed—classes that were required for him to be released back into the general population—the positive effects of that coursework do not convince the Court that Pena has any less significant chance of reoffending upon a lesser term of incarceration. Contrary to defense's argument that supervised release can assuage concerns about recidivism, a shorter sentence does not achieve the same purpose. While the likelihood of recidivism does decrease with

age, Pena has demonstrated no behavior that would allow the conclusion he is amenable to ceasing his criminal conduct.

Third, the Court finds that a sentence of 360 months' incarceration is sufficient, but not greater than necessary, to protect the public from future crimes of the defendant. § 3553(a)(2)(C). As this discussion highlights in every section, Pena poses a great danger to the public when he is in possession of a dangerous weapon or firearms. The offense conduct underlying his juvenile adjudication for armed robbery supports this conclusion, particularly in light of the explicit sexual threats he made against an unsuspecting female in her home when he was age fourteen. Since that time, Pena has continued to pose a threat to the public. The Lacey carjacking, the Roswell drive-by shootings, and the Luna vehicle theft all demonstrate that Pena will threaten innocent victims or the public at large when in possession of a firearm. Finally, his weapons possession violations while incarcerated indicate a high security threat on the BOP violation ranking system. Exhibits 9 and 10 show knives with 6.5- and 3.5- inch blades, which could cause life-threatening or deadly injury to other inmates or BOP personnel. Furthermore, USP Beaumont officials determined that Pena posed a credible threat to another inmate, who made a request for protective custody—it was upon that complaint that prison officials found the knife in Exhibit 10. Pena poses a significant threat to the public, and the Court imposes this upward variance in heavy consideration of the need to protect the public from Pena's future crimes. A lesser sentence, even with a term of supervised release, will not adequately provide for the public's protection because this term of incarceration is sufficient but not greater than necessary considering Pena's relevant criminal history, his offense conduct, and his post-conviction conduct.

Finally, the Court considers the importance of providing Pena with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

§ 3553(a)(2)(D). The coursework Pena has completed, as well as obtaining his GED or high school diploma, is relevant to the positive effects that educational and vocational coursework may have on his post-incarceration job prospects. The PSR states that "Mr. Pena has reported he has never held a job in his entire life." PSR, ¶ 96. The upward variance does not rest on this ground, however, because 18 U.S.C. § 3582(a) "precludes sentencing courts from imposing or lengthening a prison term to promote an offender's rehabilitation." *Tapia v. United States*, 564 U.S. 319, 332 (2011).[17]

For these reasons, the Court rejects Pena's argument that the extent of the Government's request for an upward variance in this case is substantively unreasonable. The Government has cited the Tenth Circuit affirmance of lengthy upward variances in *United States v. Pinson*, 542 F.3d 822, 836 (10th Cir. 2008) (affirming 135-month upward variance when district court found, pursuant to § 3553(a)(2)(C), that defendant posed a significant danger to the public); *United States v. Gantt*, 679 F.3d 1240, 1250 (10th Cir. 2012) (ruling that upward variance of thirteen years when Defendant was convicted of § 924(c) was reasonable); and *United States v. Worku*, 800 F.3d 1195, 1207–08 (10th Cir. 2015) (affirming upward variance of 31 levels from applicable guidelines range as reasonable). Defendant has attempted to distinguish these cases on the facts, but his argument is unavailing.

The circumstances in *Pinson* and *Worku* did involve circumstances that are certainly uncommon. In *Pinson*, the district court imposed a 135-month upward variance based in most part on the determination that the defendant posed a serious danger to the public in committing future crimes. 542 F.3d at 835. The offense conduct included a juvenile history of threatening and offensive behavior aimed at political figures and his own mother, as well as evidence of torturing

---

[17] At the hearing, defense counsel mentioned the burden on taxpayers in funding long-term incarceration of this defendant. Defense counsel did not submit any evidence or further argument on this point, but an unspecified concern about taxpayer funds does not garner any weight when compared to the significance of the factors as the Court discussed them above, especially concerning public safety.

and killing animals. *Id.* In *Worku*, the district court imposed an upward variance because of the defendant's prior human rights abuses, based on the rationale that the Sentencing Guidelines did not adequately punish the offense conduct. 800 F.3d at 1208. In distinguishing these cases on the facts, Defendant argues that these are the kind of circumstances that support a large upward variance. Defense counsel is right, but the Tenth Circuit's findings of substantive reasonableness in those cases are not limited to those extraordinary facts. Importantly, the Supreme Court has expressly "reject[ed], however, an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range." *Gall*, 552 U.S. at 47. These cases provide guidance in how to satisfy the Tenth Circuit review of procedural and substantive reasonableness in imposing an upward variance, but the rulings in those cases do not limit an upward variance to only those facts. *See also United States v. Lente*, 759 F.3d 1149, 1155–56 (10th Cir. 2014) (affirming this Court's upward variance to a 192-month sentence when the Circuit had previously ruled the same 192-month sentence in the same case was procedurally unreasonable because the court failed to address arguments for leniency).

Furthermore, the circumstances and explanation in *Gantt* support this Court's decision to upwardly vary in Pena's case. In *Gantt*, the defendant was indicted for bank robbery, brandishing a firearm in violation of § 924(c), and being a felon in possession of a firearm. 679 F.3d at 1243. The defendant pleaded guilty to the § 924(c) brandishing charge, which required a seven-year mandatory minimum, and the Government dismissed the other counts. *Id.* The sentencing judge heard victim witness testimony and considered the defendant's juvenile adjudications for violent crimes, including a past firearms charge for conduct characterized by the court as "shooting indiscriminately" at an individual in an altercation. *Id.* at 1245. The sentencing judge also noted that the defendant had previously been paroled, which was revoked for a violation. *Id.* at 1245.

In *Gantt*, the sentencing judge imposed a thirteen-year upward variance, for a total sentence of twenty years on the § 924(c) charge, which the Tenth Circuit affirmed. *Id.* at 1244–45. The Tenth Circuit noted that the sentencing court "could not have been clearer that it had considered the advisory guideline sentence. To consider is not necessarily to adopt." *Id.* at 1248. In affirming the substantive reasonableness of the twenty-year sentence on the § 924(c) charge, the Tenth Circuit explained that "[u]nder a deferential abuse-of-discretion standard, we deem a sentence unreasonable only if it is arbitrary, capricious, whimsical, or manifestly unreasonable." *Id.* at 1249 (citation and quotation marks omitted). The Circuit found the district court's explanation of the variance satisfied this standard on review, and the Circuit specifically explained that the "Defendant was convicted of brandishing, but the brandishing was not an isolated act; Defendant brandished his gun during the course of an armed robbery of a federal credit union." *Id.* Thus, the Circuit relied on the district court's explanation regarding "the seriousness of the offense, Defendant's recidivism in using firearms, and the need to protect the public" in its ruling that, "[i]n these circumstances, the 20-year sentence was within the range of reasonableness." *Id.* The facts and explanation in *Gantt* thus support this Court's decision to grant the Government's request for an upward variance in this case, especially considering the factual similarities and concerns about recidivism, public safety from future crimes, and prior firearms convictions involving violence.

For similar reasons as those reflected in the opinion in *Gantt*, the Court here places 240 months of the weight of the upward variance onto the § 924(c) conviction in Count 4. First, the Court notes that although Pena's conduct is sufficient to subject him to the 84-month mandatory minimum for brandishing a firearm, the parties agree that Pena is subject to a 60-month mandatory minimum because of a defect in the indictment. *See* 18 U.S.C. § 924(c)(1)(A)(i), (ii); Doc. 217 at 9 n.1. Following the bench trial, this Court found that Pena brandished his firearm during the Lacey

carjacking. Doc. 71, Sec. I.C, ¶ 18 ("Pena knowingly carried a firearm on April 6, and used it by brandishing it at Arthur and Collette Lacey when invading their home and stealing the Cadillac."). The fact that the United States did not properly charge in the indictment does not change the facts surrounding Pena's conduct. Additionally, Pena's conduct in brandishing the firearm was not isolated, just as the court noted in *Gantt*. Pena also brandished or used a firearm during the Luna vehicle theft and during the drive-by shooting, both of which threatened public safety with death or serious bodily harm. The Court has described in detail the dangerousness of these firearms offenses throughout this opinion. Furthermore, the pattern of dangerous firearms possession and use in Pena's history constitutes proper grounds for allocating the greater part of the weight of the upward variance onto the § 924(c) charge.

Finally, the Court imposes this sentence in consideration of the sentencing factors in § 3553(a), including in consideration of the Sentencing Guidelines. Having found that the correctly calculated adjusted Sentencing Guidelines range is 123–138 months, the Court notes that it would have imposed this same upward variance for the foregoing reasons even if the Court had ruled that the Sentencing Guidelines range was 170–197 months, as Defendant and the Government had originally agreed. *See* Docs. 200, 205. Thus, the Defendant received the benefit of any error in the Guidelines calculations, as well as a benefit of ten years' reduction from his original sentence. This Court's "cogent explanation" of the sentence imposed here provides a thorough explanation of why a total sentence of 360 months is appropriate, and why the § 924(c) charge properly bears the weight of it. *See United States v. Gieswein*, 887 F.3d 1054, 1063 (10th Cir. 2018) (affirming district court decision to impose same sentence even though defendant's new range was less than half of his prior range because district court provided "cogent explanation" of sentencing rationale).

**CONCLUSION**

Thus, pursuant to this Court's sentencing authority, the Court finds that a sentence of 360 months' incarceration is sufficient, but not greater than necessary, to satisfy the goals of sentencing articulated in 18 U.S.C. ¶ 3553(a)(2). In reaching a sentence that satisfies the goals in § 3553(a)(2), "[t]he Supreme Court has reaffirmed that district courts have wide discretion in choosing the factors it considers during sentencing." *See United States v. Pinson*, 542 F.3d 822, 838 (10th Cir. 2008) (citing *Gall v. United States*, 552 U.S. 38, 57–58 (2011)). This Court has placed great weight on the determination that Pena's offense conduct and his history and characteristics support this upward variance, and that the properly calculated advisory Sentencing Guidelines range does not capture a sentence that would satisfy the sentencing goals of § 3553(a)(2), particularly in protecting the public and deterring future criminal conduct.

A sentence of 360 months' incarceration is a sentence that reflects the seriousness of the offense, promotes respect for the law, and provides just punishment; affords adequate deterrence to criminal conduct; protects the public from future crimes of the defendant; and provides the defendants with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. Accordingly, for the reasons provided in this *Memorandum Opinion and Order*, the Defendant is committed to the custody of the Bureau of Prisons for a term of incarceration of 360 months.

**IT IS SO ORDERED.**

_____
CHIEF UNITED STATES DISTRICT JUDGE